MAAHS *v.* MAAHS.

1. BILLS AND NOTES—PAYMENT—EVIDENCE.
    In executor's suit against his brother with whom their mother, the decedent, had lived for about a year prior to her death near the age of 90, finding of court that purported signatures evidencing payment of defendant's note were not those of decedent is not disturbed under record presented.

2. BANKS AND BANKING—JOINT ACCOUNT—SON AS SURVIVOR OF AGED MOTHER.
    Defendant son was entitled, as survivor of himself and mother who had lived with him for about a year before her death, to

proceeds of bank account that had been made joint while she was ill some two weeks before her death at near the age of 90 (3 Comp. Laws 1929, § 12063, as amended by Act No. 286, Pub. Acts 1937).

CHANDLER, STARR, and SHARPE, JJ., dissenting in part.

Appeal from Jackson; Simpson (John), J. Submitted October 6, 1943. (Docket No. 22, Calendar No. 42,483.) Decided December 29, 1943.

Bill by Walter T. Maahs, executor of the last will and testament of Anna Maahs, deceased, against Otto Maahs and Jackson City Bank & Trust Company to determine ownership of a bank account, to recover assets and to enforce payment of an obligation. Decree for plaintiff. Defendant Maahs appeals. Affirmed in part, reversed in part.

*John E. Shekell,* for plaintiff.

*Robert Crary* and *James J. Noon,* for defendant.

CHANDLER, J. (*dissenting in part*). Plaintiff and defendant Otto Maahs are brothers and the sons of Anna Maahs, deceased. This action was instituted by plaintiff as executor of the last will and testament of said deceased to recover funds deposited in a savings account in the defendant bank in the joint names of Otto Maahs and deceased, said account being made payable to either or the survivor. The bill of complaint also prayed for the recovery of any other assets in the possession of defendant Maahs belonging to the estate.

The record shows that deceased acquired the property in dispute from the estate of her husband who predeceased her. Among the assets so acquired were four postal savings certificates of the face value of $500 each. These were assigned to the

deceased from the estate of her husband on December 5, 1940. At that time, deceased was residing in the village of Norvell in a house adjacent to the home of plaintiff, and the latter, who was also administrator *de bonis non* of his father's estate, continued to handle his mother's property for her. On February 1, 1941, the postal savings certificates were cashed and the proceeds therefrom placed in an account in the joint names of decedent and plaintiff in the defendant bank, payable to either or the survivor. The bank records show that the initial deposit made on February 1, 1941, was in the amount of $2,000 and that subsequently two other deposits were made in the aggregate amount of $130, exclusive of a credit of interest in the amount of $5.32. On September 3, 1941, this account was closed and it stood in the name of deceased alone until May 1, 1942, when it was changed to the joint names of Otto Maahs and Anna Maahs. The balance of the account in the amount of $1,273.75 was paid into court by the defendant bank on November 4, 1942.

In the spring of 1941, deceased, who was then approaching the age of 90, was taken seriously ill and it was thought she had little chance for recovery. However, she did improve and in the early part of April, 1941, defendant Maahs came to Norvell and took her to his home in Jackson where she lived until the time of her death in May of the following year. It was during this period, while living in Jackson with defendant Maahs, that the bank account was made payable to him and deceased jointly.

Relative to the bank account, the trial court found that ownership thereof did not pass to defendant Maahs upon the death of his mother and that the same was an asset of her estate.

Under the statute (3 Comp. Laws 1929, § 12063, as amended by Act No. 286, Pub. Acts 1937 [Comp. Laws Supp. 1940, § 12063, Stat. Ann. 1942 Cum. Supp. § 23.303]), a rebuttable presumption is created that the surviving joint depositor is the sole owner of the fund deposited in the manner the deposit in question was made. *Allstaedt* v. *Ochs,* 302 Mich. 232.

The bill of complaint charged fraud and undue influence exerted by defendant Maahs in connection with the creation of the account. The record shows that when the account was in the joint names of deceased and plaintiff, the latter claimed no interest in the fund, the arrangement existing purely for convenience in transacting business for the deceased, and to enable plaintiff to draw checks in payment of deceased's expenses.

The most pertinent testimony bearing directly upon the circumstances surrounding the delivery of the bank book and other assets of the father's estate to either Mrs. Maahs, Otto or their attorney, Mr. Crary, was given by Albert B. Carroll, an attorney who represented plaintiff in the administration of his father's estate, and who prepared a will for deceased. He testified:

"*A.* I was present at a meeting between Anna Maahs, Mr. Crary, and Otto Maahs. I won't be certain that Walter Maahs was present at that meeting * * * that meeting was some time after Mrs. Maahs had been taken to Jackson by Otto. The talk took place at my office. That meeting was the result of perhaps two or three, maybe more talks I had theretofore with Mr. Crary, and it was the purpose primarily of satisfying me on behalf of Walter that Mrs. Maahs wanted the money transferred from the joint account she had with Walter to, I believe, a joint account with Otto and

herself, and there were some other assets that they wanted turned over—Mr. Crary wanted turned over. I believe there was a promissory note that Otto had signed mentioned in the inventory, there might have been something else.. I think the note was turned over at that time.

"*Q.* You had the note in your possession?

"*A.* At one time I did, yes.

"It is my recollection that I turned the note over, and I think the pass book of the account. I do not think I had any talk with Otto about payment of the note. I talked with Mr. Crary about it but not seeking payment, just conversation. There was further talk in my office that I recall. I told Mr. Crary, I think on that occasion and on others that the only interest I had in the matter was to see that the money was turned over to Mrs. Maahs or to Mrs. Maahs and Otto and to see that was the way she wanted it, and I was assured that that was what she wanted. I talked with her myself and became satisfied that was what she wanted, and I think Mr. Crary stated to me that they wanted it that way to handle as Walter had handled it theretofore for the convenience in paying the bills of Mrs. Maahs, that it be a joint account. I don't recall any further conversation.

"*Q.* Do you recall whether Otto said anything about his not having any interest in the money?

"*A.* Whether it was Otto or whether it was Mr. Crary, I don't know, but that was the understanding there that morning, that his interest was to be no more in the account than Walter's had been, and Walter had never claimed any interest in this account with his mother."

The trial court held that the foregoing testimony rebutted the statutory presumption that defendant Maahs was the owner of the bank account as the surviving depositor, and that it appeared therefrom that when the account was made joint the in-

tent was that it was for the same purpose that it had originally been in the joint names of deceased and plaintiff, namely, for convenience in transacting business and to enable Otto to make withdrawals as the needs of the deceased might require; and further that the presumption of ownership by the survivor was rebutted and that the balance of the account belonged to the deceased and should be turned over to plaintiff as executor of her estate.

If the record contained no testimony or circumstances indicative of undue influence or fraud on the part of Otto in his dealings with his mother, we would be of the opinion that the trial judge was in error in his holding that the presumption of ownership of the joint bank account by Otto after her death had been met and overcome by the foregoing quoted testimony, and that said account became the property of the estate upon her demise. However, a careful review of the record and exhibits is most convincing that the trial judge in his decree reached the right result.

The decedent Anna Maahs was a native of Germany, and died on May 14, 1942. Her husband died around May, 1940. He left an estate consisting of a house and lot in Norvell, Jackson county, next door to the son Walter, four postal savings certificates of $500 each, cash in Jackson City Bank in the amount of $1,026.35, one promissory note for $590 signed by defendant Otto and inventoried at $684.35, an account for money loaned to decedent's son Albert, amounting to $317.50 which was inventoried at $1, and household furniture inventoried at $50. All was bequeathed to his wife, Anna, who was named as executrix.

Anna Maahs, according to the record, could neither read nor write English and was very hard of hearing. The record further discloses that "she could speak some English, but not so much." The record

does not disclose to what extent she understood English.

The record is convincing that Anna Maahs never, after the death of her husband, had any business transactions of any nature, but that all of her affairs were intrusted by her to her sons Walter and Otto. Walter transacted her business until about April, 1941; Otto from that time until her death in May, 1942. During these periods the relationship of each to the aged and feeble mother was clearly and purely a fiduciary one, and each was bound to exercise a high degree of fairness and good faith in all of their dealings with her. No complaint is made in this proceeding of any violation of this trust on the part of Walter.

The record and the original exhibits in the case which are before us are convincing that defendant Otto Maahs at some time between September 3, 1941, and the date of the death of his mother, perpetrated or attempted to perpetrate upon her the grossest kind of fraud by forging or causing her name to be forged to a receipt for interest on the $590 note above referred to, and also to a cancellation of said note. The receipt is exhibit 2 in the case and reads as follows:

"          No. _____          Dec. 15          19 41 ___

          Received of ____ Otto  Maahs ____

                                                                    $60.00
          Sixty .............................Dollars
          _____
                                100
          For intrinst of car note in full
          _____
$60.00                    ss/Anna Maahs.                    "

The cancellation on the note, exhibit F, reads:

"Paid in full with intrist Feb 5–1942
                              ss/ANNA MAAHS"

With reference to these two items the trial court said:

"The next item is that of the promissory note in the amount of $590 executed by Otto Maahs and which is now held by the estate, but the defendant, Otto Maahs, claims that this note is paid. The note was introduced in evidence and is known as Exhibit F. The signature of the defendant, Otto Maahs, was torn off, when it is unknown to the Court. There is written on the note 'Paid in Full with interest February 5, 1942.' and an alleged signature of Anna Maahs underneath, but in the opinion of the Court that signature of Anna Maahs is not the real signature of Anna Maahs, and the same applies to the receipt, Exhibit 2, in the case. That signature likewise, in the opinion of the Court, is not Anna Maahs', but was made by someone else, as a careful analysis of those signatures as compared with the signatures on the bank cards shows that they are not the same."

Appellant complains of this procedure stating that the court made a finding upon which there was no evidence, and that no issue was raised at the trial as to the genuineness of the handwriting on exhibits F and 2. We are in accord with the finding above quoted. Our examination of these exhibits conclusively establishes to our minds that the signatures to the receipt and the note cancellation are forgeries. Furthermore, the bank records do not show any deposits made by Anna Maahs or by any one on her behalf after the initial deposit of $2,000 to the joint account of Anna and Walter, except three small items of interest and one of $50 and one of $80 in February, 1941. It is thus clear that the mother never received any money on the note in question from Otto.

The same close, confidential and fiduciary relation existed between Otto and his mother at the time the

bank account was transferred from the name of
Anna to a joint account in the name of Otto and
Anna Maahs on May 1, 1942.

In view of the circumstances above related and
others hereinafter mentioned, we find it incumbent to
follow a well-known legal principle, that courts of
equity regard with suspicion and scrutinize with
vigilance a transaction between parties to a fiduciary
relation whereby the trustee is alleged to be a donee
of the one reposing the trust.

If the foregoing rule is applicable where the
trustee is merely alleged to be the donee of the one
reposing the trust, what degree of vigilance is re-
quired by the court when it clearly appears that the
trustee about the time of the transaction complained
of has attempted to secure by means of forgery a
cancellation of his indebtedness to the donor?

It appears from an exhibit in the case that Anna
Maahs died May 14, 1942. The date of the creation
of the joint bank account between Otto and Anna
Maahs was May 1, 1942. The vice president of the
bank testified:

"The account was originally opened in the name
of Anna Maahs, and the account was opened 9-3-41,
the 3d of September, 1941. On the 1st of May, 1942,
*by process of signing this contract card,* Anna
Maahs changed the account from her own name into
a joint account with Otto Maahs, payable to either
or the survivor. On the slip appears two signatures,
Otto Maahs and Anna Maahs. That is a require-
ment before this change in form could be accom-
plished. The contract is on the back. That would
not require them to have the book with them unless
funds were withdrawn at the time. It shows that
from the time the entry was made as an original
deposit in the name of Anna Maahs, September 3,
1941, it presumably remained in just that form until
May 1, 1942, when it was made joint with Otto

Maahs. That is the status of it now, a joint account so-called. (Italics ours)

"By the Court:

"*Q.* Did you say it started out as her individual account?

"*A.* Yes.

"That is Anna Maahs. It was not made joint with her and Otto. It shows certain withdrawals. I will state them. On December 15, 1941, there was a withdrawal of $10.67. On March 12, 1942, there was a withdrawal of $135.32. On May 14, 1942, there was withdrawal of $75. On May 19, 1942, there was a withdrawal of $560. On July 1, 1942, there was a withdrawal of $100. Those were all the withdrawals except the withdrawal of November 4, 1942, when the balance of $1,273.75 was paid into Court. Our bank account shows that Otto Maahs has another account in the bank. * * *

"It is a savings account in the name of Otto Maahs. It has a balance in of $794.13.

"The original deposit was made October 9, 1942, and was $844.13. There has been nothing added. There was a withdrawal on February 11, 1943, of $50."

There is an absence of direct testimony in the record as to who caused the transfer of the individual account in the bank standing in the name of Anna to a joint account in the name of Otto and Anna. However, the reasonable inference to be drawn is that it was defendant Otto. It is conclusively established by the original exhibit C, which is before us, being an exemplification of the record of the admission to probate in the probate court for the county of Jackson of the last will and testament of Anna Maahs, deceased, and testimony given by defendant's witness and wife, Blanche Maahs, which we will later quote, that Anna was not present at the bank at the time that this transfer was made. Ex-

hibit C shows that Mrs. Maahs died on the 14th day of May, 1942. The records and exhibits disclose that the transfer was made on May 1, 1942. Defendant's wife on direct examination testified as follows:

"She (meaning Anna) was in bed and critically ill before her death for two weeks anyway, it might be a little bit more. She was a very alert person. She would depend on me a good many times just like anyone with a daughter, if she wanted anything done, any little thing, she trusted me. I always did do it."

On cross-examination, this witness testified:

"She (meaning Anna) was sick about three weeks, her last illness. Yes, confined to her bed."

Further, on recross-examination, this same witness testified:

"*Q.* I understood you to testify yesterday that Mrs. Anna Maahs was in bed three weeks before she died.
"*A.* Well—* * *
"*Q.* Is that right?
"*A.* Did I say exactly or about that time?
"*Q.* I understood you to say that she was confined to her bed three weeks and I put my question so you could answer it directly.
"*A.* Well, as near as I can recall, it was two weeks or a little better, or about that time.
"*Q.* Two weeks or a little better. Is that right?
"*A.* I don't believe it was quite three weeks."

It is, therefore, conclusively established that the decedent was not at the bank on May 1, 1942, when her account was closed and the joint account was created. She was critically ill and in bed in her last illness. She could neither read nor write English, and she therefore could not have intel-

ligently signed the signature card and the contract
for a joint account without someone who could read
English reading and explaining it to her, and there
is no testimony in the record, nor any circumstance
other than her signature on the card, from which
even any inference could be drawn that she know-
ingly participated in any way in causing the trans-
fer of the account standing in her individual name
to a joint account in the name of Otto and herself.

If there ever was a case where one was acting in
a capacity of trust and confidence in his dealings
with his mother it is present here. The decedent
was upwards of 90 years of age with no business ex-
perience, unable to read or write the English lan-
guage, enfeebled by old age and sickness, who, on
her death bed, intrusted all of her affairs financial
and otherwise to a son in whom she had implicit
faith and trust, transferring an account of upwards
of $2,000 standing in her individual name to a joint
account with said son. She was entitled to receive
from him fair and honest treatment in all trans-
actions involving the disposition of property. This,
decedent did not have from defendant. We know
from the records and exhibits that by fraud he at-
tempted to obtain a cancellation of his note of up-
wards of $500. It must have been clear to all who
were familiar with Mrs. Maahs that on May 1, 1942,
that she was in her last illness. The record shows
that Mrs. Maahs unhesitatingly signed any papers
that were presented to her by either of her two sons,
Walter and Otto, in whom she had implicit faith
and confidence.

Under the circumstances as disclosed by the record
and exhibits, a justifiable conclusion must follow that
this trust was grossly abused by Otto, and that the
burden was upon him in connection with the transfer
of this bank account to show that it was obtained

without undue influence, in absolute good faith, and without any taint of fraud or unfair dealings in connection therewith.

The opinion of this court in *Van't Hof* v. *Jemison,* 291 Mich. 385, is applicable to the instant case. We there held that if defendant was to become the owner, as survivor, of the joint bank account it was because it was a gift to him of the balance remaining in such account upon the death of the donor and that he exercised no undue influence in procuring it. See, also, *Scheibner* v. *Scheibner,* 220 Mich. 115.

Here, the burden was upon defendant Otto to show that decedent on May 1, 1942, fully understood the terms, import and effect of her signature to the joint account contract, and if her intent was as expressed therein, to show that such intention was not produced by undue influence exerted by him.

A careful review of the record and exhibits is not only convincing that defendant has not met this burden, but is conclusive that this aged and enfeebled old lady on her death bed, critically ill, could not, and did not, on May 1, 1942, understand the nature, import and effect of her signature to this joint account contract.

Entertaining these views, we hold that the trial court did not err in decreeing that the balance of this joint bank account is the property of the estate of Anna Maahs, deceased.

The appellant contends:

"That possession of a note by the maker is always a circumstance to show payment unless explained by the plaintiffs in their action. This is true because possession by the maker by every logical inference tends to show payment. If it is not contradicted or explained the presumption of payment must stand."

Under the circumstances disclosed here, where de-. fendant was handling deceased's business affairs and had possession and control of all her assets to enable him to do so, the presumption of payment of a note because the maker has possession thereof is inapplicable.

The pleadings put the note in issue and the answer of appellant alleged payment thereof. The issue of payment was, therefore, squarely presented and the genuineness of the signature to the indorsement of payment on the note and to the receipt became important in deciding whether payment had actually been made. If they were not genuine, as the court found, they would be no evidence of payment. The primary issue was whether payment had been made and in determining it the court had a right to consider and decide the issue as to whether the indorsement and the receipt were competent evidence thereof. As he found as a fact that the purported signatures were not genuine, he properly held that the items should not be considered as evidence of payment. We might also add that in our opinion the conclusion as to the genuineness of the signature on the two exhibits was one of fact, which the trial court had a right to determine in the absence of testimony from handwriting or other so-called expert witnesses if he chose to do so. The burden of proof of payment was upon appellant which he failed to meet.

Decree should be affirmed, with costs to plaintiff against appellant.

Starr and Sharpe, JJ., concurred in the result.

North, J. Careful consideration of the record on this appeal seems to me to force the conclusion that appellant has a right of survivorship in the joint bank account. For that reason I am unable to con-

cur in Mr. Justice CHANDLER's opinion for complete affirmance.

Chronologically the pertinent facts leading to the joint bank account are as follows: Funds which Anna Maahs received from the estate of her deceased husband were placed in a joint bank account in the names of Anna and her son Walter with right of survivorship on February 1, 1941. At the behest of Anna, and seemingly because of some trouble she had with Walter concerning property matters, this joint account was closed and the funds transferred in the same bank to her individual name on September 3, 1941. For practically eight months the deposit continued in Anna's individual name, and then on May 1, 1942, it was transferred to the joint names of Anna and her son Otto with right of survivorship. It so remained until Anna's death.

There is no showing of fraud or undue influence incident to the change on May 1, 1942, of Anna's personal bank account to the joint account with right of survivorship in the names of Anna and her son Otto. While there may have existed the opportunity for exercising undue influence, a showing of such opportunity is not sufficient; and we have so held many times. *In re Grow's Estate,* 299 Mich. 133; *In re Rowling's Estate,* 291 Mich. 218, and cases cited.

The controlling aspect of the instant record is the total absence of any testimony incident to the creation of the joint account with Otto which in any way tends to overcome the statutory presumption of Otto's right of survivorship in the joint account. See 3 Comp. Laws 1929, § 12063, as amended by Act No. 286, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 12063, Stat. Ann. 1942 Cum. Supp. § 23.303).

The testimony quoted in my Brother's opinion as to a change in the bank account relates to the transfer of the bank deposit from the joint names of

Walter and his mother to the account in the individual name of the mother. This testimony in no way refers to or discloses any intent as to the right of survivorship on the part of the mother at the time the account was changed from her individual name to a joint account with right of survivorship in herself and her son Otto. This latter change in the account occurred approximately eight months after the transaction to which the testimony quoted by my Brother relates. Testimony of that character in no way tends to negative the presumption provided in the statute which reads:

"The making of the deposit in such form (joint account with the right of survivorship) shall, in the absence of fraud or undue influence, be prima facie evidence, * * * of the intention of such depositors to vest title to such deposit and the additions thereto in such survivor or survivors." 3 Comp. Laws 1929, § 12063, as amended by Act No. 286, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 12063, Stat. Ann. 1942 Cum. Supp. § 23.303).

I am unable to agree with several inferences which Mr. Justice Chandler draws from the record. There is direct and satisfactory testimony that when Anna Maahs was critically ill at Norvell and while dependent for care on her son Walter and his wife, Anna was neglected and unhappy. Testimony to that effect was given by Mrs. Sterling who at Otto's request took care of Mrs. Maahs during a brief period just prior to her going to Otto's home. This witness was disinterested and unrelated to any of the parties concerned in this litigation. She testified that three or four days before Mrs. Maahs was taken to Otto's home, she said: "She wanted me to call Otto; she wanted to go live with him." Her wish was granted by Otto, who took her to his home in Jackson, and undisputed testimony shows that the home, the main-

tenance and care she there received during the re-
maining months of her life were the best that Otto's
circumstances could afford. Dr. Wells, who was
Anna Maahs' attending physician, testified of her
strong desire to go to her son Otto, and of the fine
care she received while living in his home.

My Brother speaks about fraud and undue in-
fluence. Except my Brother infers it from his con-
struction of the testimony, there is no evidence of
fraud; and in plaintiff's own brief it is stated: "the
record is silent about the question of undue in-
fluence." My Brother says Otto "transacted her
business" after his mother went to his home; but
aside from caring for his mother, what "business"
was transacted for her? All that is disclosed by the
record is that she instituted a suit against Walter to
set aside a deed to her Norvell home on the alleged
ground of fraud, and two withdrawals from her bank
account—$10.67, December 15, 1941, and $135.32,
March 12, 1942. During this period the account was
in the individual name of Anna Maahs, and ob-
viously the withdrawals must have been on her per-
sonal order. If the above constitutes "transacting
business" in the sense that a "confidential relation"
arises, then every child who cares for a parent in
the last days or months of a parent's life must, be-
cause of such "confidential relation," assume the
burden of sustaining, whenever attacked by another,
the validity of any transaction through which the
child receives property from the parent. Such is
not the law in this jurisdiction. Instead, it is pre-
sumed that a child may care for a parent and still
be honest in dealing with the parent. On the factual
background of this case, it should not be held that
the burden of proof was on the defendant Otto, in-
stead of on Walter who instituted the suit. That
the record does not contain testimony covering all

the circumstances attending acts between Otto and his mother is obviously a necessary result arising from Otto's inability to testify to matters equally within the knowledge of the deceased, this being prohibited by statute.   3 Comp. Laws 1929, § 14219 (Stat. Ann. § 27.914)

It is said in my Brother's opinion that according to the record Anna could not write; but no one questions the fact that she could and did sign her own name; and the genuineness of her signature by which her individual bank account was transferred to a joint account between herself and Otto is not challenged.   It is stressed that Anna Maahs died approximately two weeks after she thus changed the bank account; and the inference is drawn that therefore she was enfeebled and incompetent, or at least subject to undue influence.   But there is absolutely no testimony that on May 1, 1942, when the account was transferred, Anna Maahs was not perfectly competent to transact business of this character or that she could not sign her name.   A gift or other transaction is not presumed to be invalid merely because the party acting was then ill in bed and died a fortnight later.   Testimony on this phase of the case was given by defendant's wife and it was to the effect that Anna Maahs was critically ill and in bed about three weeks before her death, not that she was mentally incompetent.   It may well be inferred that defendant's mother's fear that her demise was approaching was the very reason she made the change in this bank account, or possibly the reason was the regrettable fact that her son Walter persistently refused to go to see his mother during all the months she resided with Otto.   In this connection the uncontradicted testimony of defendant's wife is:

"Well, because she went on to tell me that she wanted him to have the money jointly and then she

wanted, when she was through with it, she wanted him to go and have her funeral expenses and see that her other bills were paid; then described the ·marker he (she) wanted in the cemetery and then he could have all the rest for his own to do whatever he liked.''

Under very limited and none-too-conclusive proof, the trial court found that the purported signatures of Anna Maahs evidencing payment of Otto's note were not her signatures, and in consequence thereof it was held the note had not been paid. Without any other testimony on this issue, comparison of the challenged signatures with genuine signatures of Anna Maahs brings the conclusion that we would not be justified in reversing the holding of the trial judge. Seemingly, it is largely, if not wholly, because of this disassociated circumstance that Mr. Justice Chandler concludes that Otto's interest in the joint bank account should be nullified. I am not in accord with that conclusion. The instant case is unlike Van't Hof v. Jemison, 291 Mich. 385, which my Brother cites as authority. There the record disclosed that the joint accounts were created merely for business convenience, and that Jemison, who claimed the funds as survivor, had no kinship to Mrs. Meyers whose money constituted the deposits. Instead he was merely a neighbor or friend, and also Mrs. Meyers, who later lived in the home of Mr. and Mrs. Jemison, paid an agreed price for her keep in the Jemison home. The situation in the instant case is very different and the controversy should be governed by Lau v. Lau, 304 Mich. 218, where we said:

''Reasonably clear and persuasive proof, stronger than appears in this record, is required to overcome the statutory provision that deposits of the character here involved 'become the property of' the survivor of the joint depositors. Otherwise there

would be no security or certainty as to the rights of such surviving depositors.''

And the following, stated by Mr. Justice WIEST in *Meigs* v. *Thayer*, 289 Mich. 680, is very pertinent to the instant case:

''There having been no fraud or undue influence, we must let stand what she let stand to the time of her death.''

The provisions of the decree entered in the circuit court denying appellant the right of survivorship in the joint bank account is reversed; but the provision in the decree holding appellant liable for the unpaid balance of his promissory note is affirmed. Costs of this Court to appellant.

WIEST, BUTZEL, and BUSHNELL, JJ., concurred with NORTH, J. BOYLES, C. J., concurred in the result.